IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:11CR41 |
| | ) | |
| v. | ) | |
| | ) | FINDINGS, RECOMMENDATION |
| VICTOR S. ZUNIGA-VALENCIA, | ) | AND ORDER |
| | ) | |
| Defendant. | ) | |

Defendant Victor S. Zuniga-Valencia ("Zuniga-Valencia") has filed a motion to suppress evidence obtained as a result of a search of his pick-up, (filing no. 30). For the reasons set forth below, the motion should be denied.

STATEMENT OF FACTS

On January 7, 2011, Nebraska State Patrol Trooper Paul Hazard ("Trooper Hazard") was on patrol in Kearney, Nebraska. At Approximately 10:15 p.m. Trooper Hazard was traveling northbound on Avenue F and observed two vehicles parked on a small access road between two rows of storage units. The vehicles were parked next to each other with their headlights on. The vehicles were aligned parallel to one another, with one facing Avenue F and the other facing the opposite direction.

Trooper Hazard drove past the access road and turned his vehicle around to investigate. Trooper Hazard activated his in-car camera and pulled onto the access road between the storage units. He observed that the vehicle facing him was a white Dodge pick-up truck and the other vehicle was a green Nissan Maxima passenger car. He noticed that the driver's side window on the pick-up was rolled down.

Trooper Hazard believed the green Nissan was owned by Terry Howard ("Howard"). Trooper Hazard testified he was familiar with Howard from previous traffic stops and from recent intelligence briefings. Trooper Hazard stated:

> I've had numerous contacts with Terry Howard. I've been - I've been present in numerous intelligence briefings regarding the distribution of narcotics. My first encounter with Terry Howard was on a traffic stop in which it was later found that 17 grams of methamphetamine was thrown from a window, and I did not locate it. The second traffic stop I had with Terry Howard I arrested the driver - or the passenger of his vehicle which was the green Nissan and conversed with Terry at that time as well. And then I was also - it would have just been a few previous days - a few days prior to this contact with Terry Howard, I was provided with information that Terry Howard's vehicle and Terry Howard was observed by law enforcement, specifically drug investigators, at known or suspected drug houses or narcotics houses, that his name was coming up frequently in the distribution, specifically of methamphetamines.

Filing No. 52, Tr. 9:7-22.

As Trooper Hazard entered the access road, the white pick-up truck began to pull forward with the driver apparently trying to position the pick-up with the truck bed facing one of the storage units. Trooper Hazard also witnessed an individual he identified as Howard exit the green Nissan and begin opening one of the storage units. Trooper Hazard stopped and exited his patrol car. He approached the driver of the white pick-up, who identified himself as Zuniga-Valencia, and asked him what he and Howard were doing. Zuniga-Valencia responded that he was helping Howard move some things. Trooper Hazard then asked for identification from Zuniga-Valencia. Zuniga-Valencia asked if he could first move the pick-up next to one of the storage units. Trooper Hazard agreed.

While waiting for Zuniga-Valencia to reposition the pick-up, Trooper Hazard engaged Howard in a conversation. Trooper Hazard asked Howard what he was doing. Howard stated that he and Zuniga-Valencia were attempting to move some furniture from Howard's girlfriend's storage unit. Trooper Hazard then asked for, and received, Howard's identification. Trooper Hazard returned to Zuniga-Valencia who provided Trooper Hazard with a Mexican identification card.

Trooper Hazard took Howard's and Zuniga-Valencia's identification cards back to his patrol vehicle and instructed Howard to join him in the front of the patrol car. Trooper Hazard ran a background check on the respective identification cards. While Howard was sitting in the patrol car, Trooper Hazard ran a license and warrants check and questioned Howard about whether he was involved in any drug activity. While waiting for information from dispatch, Trooper Hazard told Howard that what Howard and Zuniga-Valencia were doing looked suspicious and that Howard's name "had started to come up in the game again." Trooper Hazard again stated he was suspicious because Howard and Zuniga-Valencia were parked in a poorly lit area between two storage units and did not appear to be attempting to move anything until they saw Trooper Hazard pull into the access road. He asked Howard if he had any drugs with him or in his car. Howard replied that he did not.

After receiving the warrant and criminal history information back from dispatch Trooper Hazard asked Howard if he had anything illegal with him or in his car. Howard again replied that he did not. Trooper Hazard sought consent to search Howard's car, but Howard denied this request. Trooper Hazard then called for service dog unit to conduct a canine sniff of the vehicles and informed Howard he would be detained until the canine sniff was completed.

Trooper Hazard exited the patrol car and asked for Zuniga-Valencia's date of birth, and after patting down Howard, asked Zuniga-Valencia if he had any illegal substances, guns or stolen property in his vehicle and requested permission to search the pick-up. Zuniga-Valencia did not grant consent to search the vehicle. Trooper Hazard stated he was going to detain Zuniga-Valencia while a canine sniff was conducted. Trooper Hazard patted Zuniga-Valencia down and instructed him to sit in the front seat of his patrol car while Trooper Hazard sought additional information about Zuniga-Valencia from dispatch.

Approximately fourteen (14) minutes after Trooper Hazard initially contacted Zuniga-Valencia and Howard, a canine unit arrived and Officer Benson of the Kearney Police Department led the service dog in a canine sniff around the exterior of both vehicles. Officer Benson informed Trooper Hazard that the service dog made positive indications for narcotics on the pick-up and the green Nissan. Trooper Hazard conducted a search of both vehicles and eventually found approximately six (6) ounces of methamphetamine in Zuniga-Valencia's pick-up. Zuniga-Valenica and Howard were arrested and transported to the police station. Zuniga-Valencia made incriminating statements when later questioned by law enforcement officers.

## LEGAL ANALYSIS

Zuniga-Valencia argues the methamphetamine removed from his pick-up and his subsequent incriminating statements should be suppressed because he was detained without the requisite reasonable suspicion.

**Detention**

The court must determine the threshold issue of when the detention began; specifically, whether Trooper Hazard had reasonable suspicion that the defendant was involved in criminal activity as of the time he detained the defendant. Zuniga-Valencia argued at the evidentiary hearing that he was detained as soon as Trooper Hazard received and retained Zuniga-Valencia's identification card. The government claims Zuniga-Valencia was not detained until he denied consent to search his pick-up and Trooper Hazard informed him he could not leave until the canine sniff was completed.

> A fourth amendment seizure of an individual occurs when governmental authorities "by means of physical force or show of authority ... restrain[ ] the liberty of a citizen." Terry, 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16. Stated another way, "the police can be said to have seized an individual 'only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.' " Michigan v. Chesternut, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality)).

United States v. Jefferson, 906 F.2d 346, 348-49 (8th Cir. 1990).

Whether a seizure has occurred is determined on a case-by-case basis because "[n]o litmus-paper test exists for distinguishing a consensual encounter from a seizure." United States v. Ninety One Thousand Nine Hundred Sixty Dollars, 897 F.2d 1457, 1461 (8th Cir. 1990). Factors the court may consider include: "the presence of several officers, the display of weapons by officers, physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication that the person is the focus of a particular investigation." United States v. Johnson, 326 F.3d 1018, 1022 (8th Cir. 2003) (internal citations omitted); see also Jefferson, 906 F.2d

at 350 (finding a person would not feel free to leave when a law enforcement officer retains the person's identification card and car rental agreement and questioned the defendant in the officer's patrol car).

The video of the encounter reveals several of the above referenced factors weigh in favor of Zuniga-Valencia's argument. For instance, Trooper Hazard arrived in his marked patrol car, was in his law enforcement uniform, and his weapon was in plain view. Likewise, Trooper Hazard's "request" for Zuniga-Valencia's identification card did not appear to provide Zuniga-Valencia with the option of refusing. Indeed, a reasonable person in Zuniga-Valencia's position would have understood the request to mean that if he was in possession of an identification card, Trooper Hazard was demanding his compliance.

Most importantly, once Zuniga-Valencia provided his identification card to Trooper Hazard, Trooper Hazard retained possession of it while he questioned Howard in his patrol car for several minutes. No reasonable person would have felt free to leave with a law enforcement officer in possession of his identification card and while the officer was questioning his companion in the patrol car. See Jefferson, 906 F.2d at 350; see also United States v. Villa-Gonzalez, 623 F.3d 526, 533-34 (8th Cir. 2010)(finding "[w]ithout his identification card, a reasonable person is much less likely to believe he can simply terminate a police encounter"). Thus, despite Trooper Hazard's characterization of the initial contact as "consensual," Zuniga-Valencia was detained as soon as he surrendered his identification card to Trooper Hazard and the detention continued while Trooper Hazard retained the license.

**Reasonable Suspicion**

Having found Zuniga-Valencia was seized for the purposes of the Fourth Amendment shortly after he was contacted by Trooper Hazard, the court must determine if the detention was supported by reasonable suspicion.

Law enforcement officers may briefly detain an individual and "conduct a brief investigative stop when they have reasonable, articulable suspicion that a person is committing or is about to commit a crime." United States v. Horton, 611 F.3d 936, 940 (8th Cir. 2010)(citing Terry v. Ohio, 392 U.S. 1, 21 (1968)).

> In considering the reasonableness of an officer's suspicion, "we must determine whether the facts collectively provide a basis for reasonable suspicion, rather than determine whether each fact separately establishes such a basis." United States v. Stachowiak, 521 F.3d 852, 856 (8th Cir.2008); see also United States v. Arvizu, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). To be reasonable, suspicion must be based on "specific and articulable facts" that are "taken together with rational inferences from those facts"—that is, something more than an "inchoate and unparticularized suspicion or 'hunch.'" Terry, 392 U.S. at 21, 29, 88 S.Ct. 1868; see also Long, 463 U.S. at 1049, 103 S.Ct. 3469. "The behavior on which reasonable suspicion is grounded ... need not establish that the suspect is probably guilty of a crime or eliminate innocent interpretations of the circumstances." Carpenter, 462 F.3d at 986. Thus, factors that individually may be consistent with innocent behavior, when taken together, can give rise to reasonable suspicion, even though some persons exhibiting those factors will be innocent. Id.; see also Arvizu, 534 U.S. at 277, 122 S.Ct. 744. "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Arvizu, 534 U.S. at 273, 122 S.Ct. 744 (quoting United States v. Cortez, 449 U.S. 411, 418, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)).

United States v. Stewart, 631 F.3d 453, 457 (8th Cir. 2011).

Reasonable suspicion must be specific to the individual who is subject to the search or seizure. That is, "'mere propinquity' . . . to another who is 'independently suspected of criminal activity does not, without more, give rise to probable cause to search . . . . ' " United States v. Valle Cruz, 452 F.3d 698, 704 (8th Cir. 2006) (quoting Ybarra v. Illinois, 444 U.S 85, 91 (1979)); see also United States v. Owens, 101 F.3d 559, 562 n. 2 (8th Cir. 1996) (applying the "mere propinquity" principle to a reasonable suspicion analysis). Although companionship alone does not justify a detention, it is one factor to be considered in the totality of the circumstances. See, e.g., United States v. Flett, 806 F.2d 823, 827-28 (8th Cir. 1986)(rejecting the "automatic companion" rule in disallowing the cursory pat-down search of any companion of an individual independently suspected of criminal activity but noting companionship can be considered in the totality of the circumstances).

Where an individual is witnessed interacting in a suspicious manner with a person suspected of illegal activity, an experienced officer may draw reasonable inferences from the facts and find reasonable suspicion to detain the individual. See United States v. Bustos-Torres, 396 F.3d 935, 943 (8th Cir. 2005). In Bustos-Torres, a law enforcement officer was conducting surveillance on a tavern on a matter unrelated to narcotics trafficking. While he was watching the tavern, he noticed a car arrive and a man leave the bar and conduct what the law enforcement officer believed to be a drug transaction. The car left the premises and the law enforcement officer witnessed a second car arrive. The same individual left the bar and this time entered the second car. The law enforcement officer could not see what occurred in the vehicle, but after a few minutes the man from the tavern exited the car, and the car left the parking lot. The law enforcement officer then conducted a Terry stop of the vehicle, driven by Bustos-Torres, and discovered drugs and a substantial amount of cash.

The question presented to the court was whether the law enforcement officer had reasonable suspicion to conduct an investigatory stop of Bustos-Torres' car. The court noted

that because the officer observed the first transaction, which he clearly believed was a drug deal, the stop of Bustos-Torres was not based on a mere hunch, but on a reasonable inference drawn from the officer's narcotics experience. Bustos-Torres, 396 F.3d at 943. The officer was able to "point to the location and the first transaction as the articulable facts giving rise to his suspicion." Id.; see also United States v. Blaylock, 421 F.3d 758, 768-69 (8th Cir. 2005)(permitting the detention of an individual and search of a vehicle based solely on the suspicious behavior of a passenger in his car even though conduct of the defendant, "when viewed in a vacuum, would not have provided the requisite reasonable suspicion"); United States v. Spotts, 275 F.3d 714, 720, 719 (8th Cir. 2002)(finding reasonable suspicion to stop a truck because it stopped in front of and later drove by a house in which police had probable cause to suspect drug transactions took place); United States v. Harvey, 897 F.2d 1300, 1303 (5th Cir. 1990)(overruled in part on other grounds)(holding law enforcement officers had reasonable suspicion to detain an individual merely because he pulled up to a suspected drug house during a police search).

In this case, based on the totality of the circumstances, Trooper Hazard had the requisite reasonable suspicion to briefly detain Zuniga-Valencia. At the time he detained Zuniga-Valencia, Trooper Hazard was aware of the following facts: 1) Zuniga-Valencia and Howard were parked side by side, facing different directions, between storage units at 10:00 p.m.; 2) the storage facility was otherwise deserted; 3) Zuniga-Valencia and Howard appeared to be interacting while sitting in their vehicles; 4) Zuniga-Valencia and Hooper did not appear to be in the process of loading or unloading a storage unit until Trooper Hazard pulled into the access road where they were parked; 5) Zuniga-Valencia and Howard told Trooper Hazard they were at the unit together; 6) Trooper Hazard was aware Howard had a criminal history involving drugs and burglary; and 7) Trooper Hazard was also aware of recent intelligence reports that Howard was distributing methamphetamine.[1]

---

[1] At the suppression hearing Trooper Hazard also testified Howard became nervous when

Zuniga-Valencia argues no reasonable suspicion existed for his detention because he was in "mere propinquity" with Howard. This assertion belies the facts as they were known to Trooper Hazard at the time of the investigatory stop. Through the initial contact with Zuniga-Valencia, Trooper Hazard established that Zuniga-Valencia was not at the storage unit facility by mere happenstance or that his purpose for being present was unrelated to Howard. Rather, Zuninga-Valencia readily acknowledged that he was there with Howard – a suspected methamphetamine dealer.

Moreover, in addition to his association with Howard, Zuniga-Valencia's presence was accompanied by suspicious circumstances and conditions. Trooper Hazard witnessed the two men interacting in what Trooper Hazard deemed, based on his experience, a questionable manner. That is, they were parked next to each other in a poorly lit, deserted storage unit facility late at night. They did not appear to be engaged in loading or unloading any of the units. Of particular note, Trooper Hazard testifed Zuniga-Valencia and Howard appeared to be interacting when Trooper Hazard arrived at the storage unit facility access road, and did not take any action consistent with unloading a storage facility until they saw Trooper Hazard's patrol car. The video of the stop confirms this version of events, showing Howard exiting his car and starting to open a storage unit, while Zuniga-Valencia began to reposition his truck as soon as Trooper Hazard's patrol car pulled down the access road. (Ex. 1).

Trooper Hazard explained the significance of Zuniga-Valencia's actions as follows:

---

Trooper Hazard questioned him about drugs. However, this questioning occurred after Zuniga-Valencia was detained. Howard's post detention behavior could not serve as a basis relied upon by Trooper Hazard for the initial detention of Zuniga-Valencia. See, e.g., United States v. Davis, 202 F.3d 1060, 1062 (8th Cir. 2000)("conduct after an investigative stop begins cannot supply the reasonable suspicion needed to justify the stop").

> Through not only my training, but my experience, it would be - it would be - it happens frequently that I could contact somebody while they're engaged in some sort of criminal activity. And as soon as law enforcement is observed or as soon as I contact them as law enforcement, the criminal activity changes to an actual legitimate form of daily business or an actual legitimate activity. And I compare that a lot of times to narcotics activity happening in a parking lot of Wal- Mart. Once law enforcement is observed, they'll exit their vehicles and they'll go into Wal-Mart.

Filing No. 52, Tr. 18:9-18. Indeed, "[f]actors that may reasonably lead to an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence." United States v. Dawdy, 46 F.3d 1427, 1428 (8th Cir. 1995).

In light of the totality of facts known to Trooper Hazard at the time of the detention, this case is readily distinguishable from those in which reasonable suspicion was not established because the defendant was in "mere propinquity" with someone engaged in suspicious activity. Compare Bustos-Torres, 396 F.3d at 943 (reasonable suspicion where the law enforcement officers established a connection between the defendant and a suspected drug dealer) with Ybarra, 444 U.S. at 91 (no reasonable suspicion to search a patron of a bar where an warrant was being executed); United States v. Clay, 640 F.2d 157, 160 (8th Cir. 1981) (no reasonable suspicion to perform a pat down of an individual who approached a house where a search warrant was being executed). Based on the specific, articulable facts known to Trooper Hazard at the time of the detention, Trooper Hazard possessed the requisite reasonable suspicion to detain Zuniga-Valencia.[2]

---

[2] Because Trooper Hazard's detention of Zuniga-Valencia was lawful, the court need not address Zuniga-Valencia's arguments regarding suppression of his incriminating post-arrest statements as fruit of the alleged Fourth Amendment violation.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Warren K. Urbom, United States District Judge, pursuant to 28 U.S.C. § 636(b), that the motion to suppress filed by Victor Zuniga-Valencia, (filing no. 30), be denied in all respects.

The parties are notified that failing to file an objection to this recommendation as provided in the local rules of this court may be held to be a waiver of any right to appeal the court's adoption of the recommendation.

IT IS FURTHER ORDERED:

1) The trial of this case is set to commence before the Honorable Warren K. Urbom at 9:00 a.m. on July 11, 2011, or as soon thereafter as the case may be called, for a duration of three (3) trial days, in Courtroom 4, United States Courthouse, Lincoln, Nebraska. Jury selection will be held at commencement of trial.

2) A conference with counsel for the parties will be held before Judge Urbom in his chambers beginning at 8:30 a.m. on July 11, 2011.

DATED this 3rd day of June, 2011.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

12