IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>VICTOR S. ZUNIGA-VALENCIA,<br><br>    Defendants. | 4:11CR41<br><br>MEMORANDUM AND ORDER ON THE DEFENDANT'S OBJECTION TO THE MAGISTRATE JUDGE'S FINDINGS, RECOMMENDATION AND ORDER |

  Defendant Victor S. Zuniga-Valencia moved to suppress evidence that was seized from his vehicle on January 7, 2011, and statements that he made to law enforcement officers on January 7 and 10, 2011. (ECF No. 30.) United States Magistrate Judge Cheryl R. Zwart presided over a hearing of this motion on April 20, 2011, (ECF No. 40), and in accordance with 28 U.S.C. § 636(b)(1)(B)-(C) and Federal Rule of Criminal Procedure 59(b)(1), the magistrate judge has recommended that I deny the defendant's motion, (see ECF No. 60). Now before me is the defendant's "Objection to Magistrate judge's Findings, Recommendation and Order." (ECF No. 64.) In the course of my de novo review of those portions of the magistrate judge's findings and recommendation that the defendant challenges, see United States v. Lothridge, 324 F.3d 599, 600 (8th Cir. 2003); 28 U.S.C. 636(b)(1); Fed. R. Crim. P. 59(b)(3), I have studied the magistrate judge's Findings, Recommendation and Order (ECF No. 60), the motions and briefs submitted by the parties, (ECF Nos. 30-31, 33, 47, 51, 64-66), the transcript of the hearing before the magistrate judge, (ECF No. 52), and the exhibits received during the hearing, (see ECF No. 43). After reviewing these materials, I find that the magistrate judge's recommendation should be adopted. The defendant's objection will be overruled, and his motion to suppress will be denied.

**I. BACKGROUND**

  The magistrate judge has summarized the relevant facts clearly and accurately, (see Findings, Recommendation & Order at 1-4, ECF No. 60), and the defendant states that he "agrees with all [of

1

the magistrate judge's] findings of fact," (Def.'s Br. in Supp. of Objections at 2, ECF No. 65). I adopt all of the magistrate judge's factual findings in full, and I shall summarize the facts again here solely in the interest of convenience.

On January 7, 2011, at approximately 10:15 p.m., Nebraska State Patrol Trooper Paul Hazard was on patrol in Kearney, Nebraska. (Tr. at 4, 5.) As he traveled north on Avenue F, he looked to the west and observed two vehicles parked on a small access road between two sets of storage units. (Id. at 5.) The vehicles were parked next to each other, but were facing opposite directions with "the driver's side windows . . . closest to each other." (Id. at 6.) Trooper Hazard "passed by," and then "turned around and . . . came back to investigate exactly what was going on." (Id. at 5.)[1]

When he pulled into the access road, Trooper Hazard determined that one of the two vehicles was "a green Nissan passenger vehicle that [he] knew to be Terry Howard's." (Id. at 5-6.) Trooper Hazard had two prior contacts with Terry Howard. (Tr. at 9.) The first involved "a traffic stop in which it was later found that 17 grams of methamphetamine was thrown from a window," but Trooper Hazard "did not locate it." (Id.) On a different occasion, Trooper Hazard stopped Howard while Howard was driving his green Nissan, and the trooper arrested Howard's passenger. (Id.) Trooper Hazard also testified that a few days before January 7, 2011, he received "information that Terry Howard's vehicle and Terry Howard [were] observed by . . . drug investigators . . . at known or suspected drug houses." (Id.) Trooper Hazard added that Howard's "name was coming up frequently in the distribution, specifically of methamphetamines." (Id.)

The other vehicle stopped on the access road was a white Dodge pickup. (Id. at 6.) The driver's side window of the pickup was rolled down, and both the pickup and the green Nissan were occupied. (Id.) None of the nearby storage units was standing open. (Id. at 7.)

Trooper Hazard approached the vehicles in his patrol unit, and as he stopped, a person whom he recognized as Terry Howard exited the green Nissan. (Id. at 7.) At about the same time, the pickup began to pull forward. (Id.) Trooper Hazard exited his vehicle and asked the driver of the pickup truck what was going on. (Id. at 8.) The driver, who was later identified as the defendant, replied that he was helping a friend move a bed from a storage unit. (Id. at 8, 25.) Trooper Hazard

---

[1]Trooper Hazard activated the video camera in his cruiser as he drove onto the access road. (See Pl.'s Ex. 1.)

asked the defendant for identification, but before providing it the defendant asked whether he could back up his pickup. (Id.) Trooper Hazard agreed to this request, and the defendant moved his truck so that the tailgate was positioned near a storage unit close to where Howard was standing. (Pl.'s Ex. 1.)

Trooper Hazard testified that, based on his training and experience, he is aware that people who are engaged in criminal activity will begin to engage in "an actual legitimate form of daily business or an actual legitimate activity" as soon as they are contacted by, or observe, a law enforcement officer. (Tr. at 18.) He said, "I compare that a lot of times to narcotics activity happening in a parking lot of Wal-Mart. Once law enforcement is observed, they'll exit their vehicles and they'll go into Wal-Mart." (Id.)

While the defendant backed up his truck, Trooper Hazard made contact with Terry Howard just as Howard began to open a storage unit. (Id. at 8-9; Pl.'s Ex. 1.) Trooper Hazard asked Howard what he was doing and requested Howard's driver's license. (Tr. at 10.) After he obtained Howard's license, Trooper Hazard returned to the pickup truck and asked the defendant for his identification and date of birth. (Id. at 10-11.) The defendant handed over a Mexican identification card. (Id. at 10.) Trooper Hazard then asked Terry Howard to sit with him in his patrol unit "due to the inclement weather," and Howard agreed. (Id. at 11.) Inside the patrol unit, Trooper Hazard "conducted a license status check, a warrants check, and a criminal history check on both subjects." (Id.) He also asked Howard again what he was doing, and Howard responded that he and the defendant were going to remove some property from one of the storage units. (Id.) Trooper Hazard spoke to Howard "about narcotics," and he observed Howard "become . . . nervous and distant or hesitant." (Id. at 12.) Howard's hands trembled, and his breathing became deep. (Id.)

A dispatcher advised Trooper Hazard that Howard had a valid license and no warrants, and he or she[2] provided the trooper with Howard's criminal history. (Id. at 12-13.)[3] The dispatcher also

---

[2] The voice of the dispatcher seems to be that of a female. (Pl.'s Ex. 1.)

[3] Trooper Hazard testified that he was "previously familiar with" Howard's criminal history, and he was already aware that "Howard had priors on his criminal history for burglary." (Tr. at 13, 19.)

advised Trooper Hazard that "the second subject's name and information . . . was not on file"; no criminal history or other information about the defendant was available. (Id. at 13.)

Trooper Hazard asked Howard "if he had time to speak with [him] a little further." (Id.) He then asked Howard about contraband and asked for permission to search Howard's vehicle. (Id.) Howard did not agree to allow Hazard to search his vehicle. (Id.) Trooper Hazard then told Howard that he would be detained, and he asked the Kearney Police Department to send a police service dog to the scene. (Id. at 13-14.)

Trooper Hazard then re-contacted the defendant to confirm the spelling of the defendant's name and his date of birth. (Id. at 14.) After verifying that his information was correct, Trooper Hazard asked the defendant whether he had any contraband in his vehicle. (Id. at 15.) The defendant denied having any contraband. (Id.) Trooper Hazard then asked for permission to search the defendant's vehicle, and the defendant refused to consent to the search. (Id.) Trooper Hazard advised the defendant that he would be "detained for a police service dog." (Id. at 15-16.)

Within 15 minutes of the trooper's first contact with Howard and the defendant, Officer Benson of the Kearney Police Department arrived with a service dog. (Tr. at 16; Pl.'s Ex. 1.) The dog detected "the odor of narcotics . . . from both vehicles," and Trooper Hazard began to search the vehicles. (Tr. at 17.) No contraband was found in the green Nissan; however, six ounces of methamphetamine were discovered underneath the steering wheel in the white pickup truck. (Id. at 17-18.)

The defendant moved to suppress the evidence obtained from his vehicle, along with certain statements that he made to law enforcement officers "[w]ithin hours of the . . . search" on January 7, 2011, and later on January 10, 2011. (Def.'s Mot. at 2, ECF No. 30.) In support of his motion, the defendant argued that he was seized in violation of the Fourth Amendment because he did not consent to the encounter with Trooper Hazard, and Trooper Hazard lacked reasonable suspicion or probable cause to detain him. (Def.'s Br. at 4, ECF No. 31.) The defendant added that the physical evidence obtained from his vehicle and his statements of January 7 and 10, 2011, were fruit of the unlawful detention and must therefore be suppressed. (Id. at 4-5.) In response, the government conceded "that if the arrest on January 7, 2011, is unlawful, then any subsequent statements are

inadmissible." (Pl.'s Br. at 6, ECF No. 33.)[4]  The government argued, however, that Trooper Hazard's detention of the defendant was supported by reasonable suspicion, and therefore there was no Fourth Amendment violation. (Id. at 5.)

The magistrate judge found that the defendant was seized "as soon as he surrendered his identification card to Trooper Hazard and [that] the detention continued while Trooper Hazard retained the license." (Findings, Recommendation & Order at 6, ECF No. 60.) She also found that this seizure was supported by a reasonable suspicion that the defendant was committing, or was about to commit, a crime. (Id. at 7-11.) In making this finding, the magistrate judge explained that the facts of this case are "readily distinguishable from those [cases] in which reasonable suspicion was not established because the defendant was in 'mere propinquity' with someone engaged in suspicious activity." (Id. at 11.)

On June 17, 2011, the defendant filed an objection to the magistrate judge's Findings, Recommendation, and Order. (ECF No. 64.) My analysis of his objection follows.

## II.  ANALYSIS

The defendant argues that the magistrate judge erred by finding that Trooper Hazard's detention of the defendant was justified by a reasonable suspicion of criminal activity. (Def.'s Br. in Supp. of Objections at 2, ECF No. 65.) He submits that he was detained solely because he was "present with a known criminal," and that this "affiliation," standing alone, "does not rise to [the] level of reasonable suspicion." (Id. at 6.) In other words, he claims that he was detained merely because of his "propinquity to [another person who was] independently suspected of criminal activity," which amounts to a violation of the Fourth Amendment. (Id. at 2 (quoting Ybarra v. Illinois, 444 U.S. 85, 91 (1979)).)

"A Terry investigatory stop allows an officer briefly to detain a citizen if the officer has a reasonable suspicion that 'criminal activity may be afoot.'" United States v. Ortiz-Monroy, 332 F.3d 525, 528 (8th Cir. 2003) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)).  See also United States v. Bustos-Torres, 396 F.3d 935, 942 (8th Cir. 2005) ("Law enforcement officers may make an

---

[4] At the hearing before the magistrate judge, the government agreed that the defendant's motion hinged entirely on "whether or not the detention was lawful." (Tr. at 3.)

5

investigatory stop if they have a reasonable and articulable suspicion of criminal activity."). "A reasonable suspicion is a 'particularized and objective' basis for suspecting the person who is stopped." Bustos-Torres, 396 F.3d at 942 (quoting United States v. Thomas, 249 F.3d 725, 729 (8th Cir. 2001)). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." Id. (quoting United States v. Halls, 40 F.3d 275, 276 (8th Cir. 1994)). The detention may last while the officer makes "'reasonable inquiries' aimed at confirming or dispelling his suspicions." Minnesota v. Dickerson, 508 U.S. 366, 373 (1993) (citing Terry, 392 U.S. at 30). "In forming a basis for suspicion, officers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" Ortiz-Monroy, 335 F.3d at 529 (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)).

     In Ybarra v. Illinois, police officers possessed a warrant to search a "tavern in which Ybarra happened to be at the time the warrant was executed." 444 U.S. at 91. The warrant authorized the search of the tavern and its bartender for "evidence of the offense of possession of a controlled substance." Id. at 88. When executing the warrant, the officers announced that they would conduct a "cursory" pat down search of all those present in order to locate weapons. Id. Ybarra was patted down, and "the officer felt what he described as 'a cigarette pack with objects in it'" somewhere on Ybarra's person. Id. The officer did not seize this object, but proceeded to pat down the other bar patrons. Id. Later, however, he returned to Ybarra, searched him again, retrieved the cigarette pack, opened it, and discovered a substance later identified as heroin. Id. at 89.

     The Supreme Court held that the pat down search of Ybarra was unconstitutional. First, the Court noted that when the warrant issued, the authorities did not have "probable cause to believe that any person found on the premises of the [tavern], aside from [the bartender,] would be violating the law." Id. at 90. The Court added,

> Not only was probable cause to search Ybarra absent at the time the warrant was issued, it was still absent when the police executed the warrant. Upon entering the tavern, the police did not recognize Ybarra and had no reason to believe that he had committed, was committing, or was about to commit any offense under state or federal law. Ybarra made no gestures indicative of criminal conduct, made no movements that might suggest an attempt to conceal contraband, and said nothing of

>  a suspicious nature to the police officers. In short, the agents knew nothing in particular about Ybarra, except that he was present, along with several other customers, in a public tavern at a time when the police had reason to believe that the bartender would have heroin for sale.

Id. at 90-91. The Court then explained,

> [A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person. Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be.

Id. at 91. The Court also determined that the initial pat down was not a reasonable frisk for weapons under the Terry doctrine because it "was simply not supported by a reasonable belief that he was armed and presently dangerous." Id. at 92-93 (citing Terry v. Ohio, 392 U.S. 1, 21-24 (1968)).

Unlike Ybarra, the defendant here was not merely present during the execution of a search warrant that left him beyond its scope. Nor was he a bystander who did nothing to arouse the suspicions of law enforcement officers prior to his detention. Rather, he was a principal actor in what Trooper Hazard reasonably believed to be a drug transaction, given the totality of the circumstances. As the magistrate judge explained,

>  In this case, based on the totality of the circumstances, Trooper Hazard had the requisite reasonable suspicion to briefly detain Zuniga-Valencia. At the time he detained Zuniga-Valencia, Trooper Hazard was aware of the following facts: 1) Zuniga-Valencia and Howard were parked side by side, facing different directions, between storage units at 10:00 p.m.; 2) the storage facility was otherwise deserted; 3) Zuniga-Valencia and Howard appeared to be interacting while sitting in their vehicles; 4) Zuniga-Valencia and Howard did not appear to be in the process of loading or unloading a storage unit until Trooper Hazard pulled into the access road where they were parked; 5) Zuniga-Valencia and Howard told Trooper Hazard that they were at the unit together; 6) Trooper Hazard was aware Howard had a criminal history involving drugs and burglary; and 7) Trooper Hazard was also aware of recent intelligence reports that Howard was distributing methamphetamine.

(Findings, Recommendation & Order at 9, ECF No. 60 (footnote omitted).) The defendant was not detained because of his mere propinquity to a suspected drug dealer, but rather because he was engaged in conduct with a suspected drug dealer that reasonably aroused the suspicions of Trooper Hazard.

I agree with the magistrate judge's conclusion that Trooper Hazard had a reasonable, articulable suspicion, based on the totality of the circumstances, that the defendant was committing or was about to commit a crime. This suspicion justified an investigative seizure "carefully tailored" to dispel that suspicion. Florida v. Royer, 460 U.S. 491, 500 (1983). The detention of the defendant for a short time in order to allow a canine to sniff the exterior of his vehicle "was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure," id., and therefore it was not unlawful. Cf. United States v. Linkous, 285 F.3d 716, 720-21 (8th Cir. 2002) (holding that officer's reasonable suspicion of criminal activity allowed him to detain suspects for a dog sniff).

The defendant criticizes the magistrate judge's reliance on United States v. Bustos-Torres, 396 F.3d 935 (8th Cir. 2005), for the proposition that "[w]here an individual is witnessed interacting in a suspicious manner with a person suspected of illegal activity, an experienced officer may draw reasonable inferences from the facts and find reasonable suspicion to detain the individual." (Findings, Recommendation & Order at 8, ECF No. 60. See also Def.'s Br. in Supp. of Objections at 2, ECF No. 65.) In Bustos-Torres, a deputy stationed in "an area of high drug traffic" observed a driver park and exit his vehicle, make contact with a man later identified as a Mr. Thelen, and pass Thelen money in exchange for a plastic baggie. 396 F.3d at 939. Although the deputy was certain that he witnessed a narcotics transaction, he did not take any action because he was on a surveillance assignment. Id. A few minutes later, the deputy's surveillance assignment terminated. Before he left the area, he observed a second vehicle enter the parking lot. Id. Thelen appeared and approached the vehicle. On this occasion, however, Thelen entered the vehicle, and the deputy "could not discern what transpired between" Thelen and the vehicle's occupants. Id. at 940. Thelen exited the vehicle within minutes, and the vehicle drove off. Id. The deputy called for backup, followed the vehicle, and conducted an investigative stop. Id. The deputy and his backup asked the occupants to exit the vehicle, performed a pat down search for weapons, discovered $10,000 in one of the occupants' pockets, and arrested the entire group. Id.

Two of the vehicle's occupants–Mr. Torres and Mr. Alfaro–challenged the finding that the deputy possessed a reasonable suspicion that justified the stop of their car. Id. at 942. The district court reasoned that the stop was supported by a reasonable suspicion because "(1) the defendants and

Mr. Thelen met in a location known to law enforcement as a hotbed for drugs; (2) [the deputy] witnessed a vehicle pull into the parking lot, Mr. Thelen emerge from Awada's and take part in an apparent drug deal with the occupants, and the vehicle drive away, all within a few minutes; and (3) [the deputy] witnessed the same sequence of events when [the defendants' vehicle] appeared, with the critical difference that Mr. Thelen entered the car and [the deputy] could not see what took place between Mr. Thelen and the defendants." Id. On appeal, the defendants argued that if these facts provide an officer with reasonable grounds for suspecting them of a crime, then "anyone who associated with Mr. Thelen after the first transaction" would be transformed into a suspect. Id. The Eighth Circuit disagreed, explaining that "an experienced narcotics officer reasonably would have believed the second car, like the first, was likely on the scene to buy drugs," and that the officer "could point to the location and the first transaction as the articulable facts giving rise to his suspicion." Id. at 943.

Zuniga-Valencia argues that his case is distinguishable from Bustos-Torres because here "the scene is not clearly as indicative of narcotics dealing." (Def.'s Br. in Supp. of Objections at 3, ECF No. 65.) He states,

> Trooper Hazard drove by a storage unit and observed two vehicles parked next to each other, at night, with their lights on. Trooper Hazard then turned his cruiser around and entered the access road between the storage units. Trooper Hazard then witnessed the pick-up move so that the bed of the truck was facing a storage unit. Trooper Hazard then saw Howard exit his vehicle and start opening the storage unit. Neither vehicle attempted to leave the area. Other than the fact that Howard is known to Trooper Hazard as having narcotics contacts, nothing about the above situation leads to a reasonable suspicion of a crime being committed.

(Id.) He adds that "[t]here is no other inference the Deputy in Bustos-Torres could have drawn other than Bustos-Torres was actively involved in narcotics," while "[h]ere, a clear inference is that a person suspected of being involved with drugs found a man who had a pick-up truck to help move bigger furniture." (Id.)

I agree that the facts of Bustos-Torres are dissimilar from those of the instant case. The principle Bustos-Torres illustrates, however–that contact with a suspected drug trafficker can, given the totality of the circumstances in certain cases, support a valid investigative detention–is applicable here. The defendant would have me set aside the fact that Howard's criminal history and suspected

drug trafficking activities were known to Trooper Hazard and conclude that the remaining circumstances can only be reasonably seen as ordinary preparations for late-night furniture moving. (Def.'s Br. in Supp. of Objections at 3, ECF No. 65. See also id. at 6 ("Absent Zuniga-Valencia being present with a known criminal, this situation is the hallmark of wholly innocent behavior.").) Bustos-Torres counsels, however, that I must determine "[w]hether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity . . . in light of the totality of the circumstances," and that contact with a suspected drug trafficker is an articulable fact that should be considered together with all of the other facts. 396 F.3d at 942. Ybarra does not hold otherwise; rather, it states that "mere propinquity" is insufficient to justify a search "without more." 444 U.S. at 91 (emphasis added).[5]

In a similar vein, the defendant argues that other cases cited by the magistrate judge are factually distinguishable from the instant case. (Def.'s Br. in Supp. of Objections at 4, ECF No. 65 (discussing the magistrate judge's citations to United States v. Spotts, 275 F.3d 714 (8th Cir. 2002), and United States v. Harvey, 897 F.2d 1300 (5th Cir. 1990)).) It is true that "[t]he validity of an investigatory stop under the Fourth Amendment turns on the detailed facts of the case at hand." Spotts, 275 F.3d at 718. After considering the totality of the facts and circumstances of this case, I am persuaded that the "particular facts known to [Trooper Hazard] amount to an objective and particularized basis for a reasonable suspicion of criminal activity" that justified the investigatory stop of the defendant. Bustos-Torres, 396 F.3d at 942 (quoting United States v. Halls, 40 F.3d 275, 276 (8th Cir. 1994)).

---

[5] I do not agree with the defendant's suggestion that "[t]here is no other inference the Deputy in Bustos-Torres could have drawn other than Bustos-Torres was actively involved in narcotics." (Def.'s Br. in Supp. of Objections at 3, ECF No. 65.) On the contrary, the deputy could not see what transpired between the defendants and Thelen, and the court characterized the deputy's inference of criminal activity as "attenuated" relative to a hypothetical case involving a longer "series of deals." Bustos-Torres, 396 F.3d at 943. In any case, the government must show only that it was objectively reasonable for the officer to infer, given the totality of the circumstances, that the defendants had been, or were about to be, engaging in criminal activity. The fact that other inferences may reasonably be drawn from the same circumstances is irrelevant.

One final point merits mention. The defendant argues, "[A]ccording to Trooper Hazard, there was only one reason he detained Mr. Zuniga-Valencia." (Def.'s Br. in Supp. of Objections at 4, ECF No. 65.) He then reproduces the following excerpt from Trooper Hazard's cross-examination testimony before the magistrate judge:

Q. And the fact that Mr. Zuniga was there with Terry Howard.

A. Yes.

Q. That's it. That's the reason you detained Mr. Zuniga.

A. Yes.

Q. Nothing else.

A. No.

Q. Am I correct?

A. That's correct.

(Id. (quoting Tr. at 22:8-15).)[6]

This testimony does seem to suggest that Trooper Hazard detained the defendant solely because he was in the presence of Terry Howard. During his direct examination and on redirect, however, the trooper described several additional specific, articulable facts that aroused his suspicion of criminal activity and led to his decision to detain the defendant. (See, e.g., Tr. at 20-21, 34-35.) These included such things as the position of the defendant's vehicle relative to Howard's, the time of night, and the fact that the defendant and Howard appeared to be interacting "but [were] not

---

[6] This excerpt is preceded by the following question and answer:

Q. . . . Trooper Hazard, you've talked a lot about Mr. Howard being nervous. So basically you asked Mr. Zuniga to remain there because of your contact with Terry Howard and all the circumstances you talked about, about Terry Howard. Is that correct?

A. It is, sir.

(Tr. at 22:1-7.)

11

moving stuff out of the storage areas." (Id. at 21.) These facts, considered in their totality, provided Trooper Hazard with a reasonable suspicion that criminal activity was afoot. The detention was not based on "mere propinquity."

**IT IS ORDERED** that:

1. the defendant's objection to the magistrate judge's findings, recommendation and order, ECF No. 64, is overruled;

2. the magistrate judge's recommendation, ECF No. 60, is adopted; and

3. the defendant's motion to suppress, ECF No. 30, is denied.

Dated June 30, 2011.

        BY THE COURT

        s/ Warren K. Urbom
        United States Senior District Judge